# UNITED STATES COURT OF INTERNATIONAL TRADE
## THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| HILEX POLY CO., LLC, et al., | ) |
| | ) |
| *Plaintiffs*, | ) |
| | ) |
| v. | )   No. 17-00090 |
| | ) |
| UNITED STATES OF AMERICA, et al., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

## ORDER

Upon consideration of the Rule 56.1 Motion for Judgment on the Administrative Record of Plaintiffs, Hilex Poly Co., LLC, et al. ("Plaintiffs"), including Plaintiffs' motion for reconsideration of the Court's June 1, 2020 Opinion And Order granting in part U.S. Customs and Border Protection's ("CBP") motion to dismiss certain aspects of the Plaintiffs' complaint, all responses thereto, and the administrative record, it is hereby

ORDERED that Plaintiffs' Motion for Judgment on the Administrative Record is granted; it is further

ORDERED that Plaintiffs' Motion for Reconsideration of the Court's June 1, 2020 Opinion and Order granting in part CBP's motion

to dismiss certain aspects of Plaintiffs' complaint (Slip Op. 20-77) is granted and that the two-year statute of limitations contained in 28 U.S.C. § 2636(i) does not bar relief with respect to CDSOA distributions for that predate April 18, 2015; it is further

ORDERED that the CDSOA's references to "interest earned" in 19 U.S.C. § 1675c(e)(2) and (d)(3) include delinquency interest under 19 U.S.C. § 1505(d); it is further

ORDERED with respect to payments of delinquency interest pursuant to 19 U.S.C. § 1505(d) paid to CBP on antidumping duties owed under the antidumping orders listed in paragraph 2 of the Complaint (the "Orders") that CBP is required by law to include all such amounts in its CDSOA distributions to affected domestic producers under the Orders, including Plaintiffs, based on their *pro rata* shares of total certified qualifying expenditures thereunder, for the federal fiscal year in which CBP received such payment; it is further

ORDERED that Plaintiffs are entitled to an accounting by CBP, by Fiscal Year, of all delinquency interest not distributed to Plaintiffs under the Orders; and it is further

ORDERED that Plaintiffs are entitled to an award, pursuant to 28 U.S.C. § 2643(a), of equitable interest to the extent necessary to compensate Plaintiffs for Customs' failure to distribute the foregoing amount within the time required by law pursuant to 19 U.S.C. § 1675c(c).

SO ORDERED.

_____
Honorable Timothy C. Stanceu, Senior Judge
United States Court of International Trade

Dated: _____, 2021

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE**

| | | |
|---|---|---|
| HILEX POLY CO., LLC, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 17-00090 |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY
RECORD AND FOR RECONSIDERATION**

Pursuant to Rule 56.1 of the Rules of this Court, Plaintiffs, Hilex Poly Co., LLC, et al. ("Plaintiffs") move for judgment on the administrative record with regard to their claims that all delinquency interest accruing under 19 U.S.C. § 1505(d) that U.S. Customs and Border Protection ("CBP") collected on late payments of duties are subject to distribution under the Continued Dumping and Subsidy Offset Act, 19 U.S.C. § 1675c ("CDSOA"). As shown in the accompanying memorandum of law, the CDSOA's directive that CBP "distribute all funds (including all interest earned on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers" unambiguously

requires CBP to distribute collected section 1505(d) interest that accrued on late payments of duties that were subject to distribution under the CDSOA. As part of their Motion for Judgment on the Administrative Record, Plaintiffs also move for reconsideration of the Court's June 1, 2020 Opinion and Order granting in part CBP's motion to dismiss Plaintiffs' claims for CDSOA distributions that pre-date April 18, 2015.

The reasons justifying Plaintiffs' motion are set forth in the accompanying Rule 56.1 Memorandum in Support of Motion for Judgment on the Administrative Record.

Respectfully submitted,

/s/ *J. Michael Taylor*
J. Michael Taylor
Jeffrey M. Telep
Jeremy M. Bylund
Neal J. Reynolds

*Counsel to Plaintiffs*

May 24, 2021

# UNITED STATES COURT OF INTERNATIONAL TRADE
# THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | | |
|---|---|---|
| HILEX POLY CO., LLC, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | No. 17-00090 |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' RULE 56.1 MOTION FOR JUDGMENT ON THE
## ADMINISTRATIVE RECORD AND FOR RECONSIDERATION

J. Michael Taylor
Jeffrey M. Telep
Jeremy M. Bylund
Neal J. Reynolds
KING & SPALDING LLP
1730 Pennsylvania Ave., NW
Washington, D.C. 20006
(202) 737-0500

*Counsel to Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

INTRODUCTION ................................................................................... 1

RULE 56.1 STATEMENT ...................................................................... 5

STATEMENT OF FACTS ...................................................................... 6

MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD ........................................................ 15

I.    STANDARD OF REVIEW .............................................................. 15

II.   THE CDSOA REQUIRES CBP TO DISBURSE
DELINQUENCY INTEREST TO AFFECTED DOMESTIC
PRODUCERS ................................................................................... 18

      A.    Congress Unambiguously Directed CBP to
           Distribute Delinquency Interest .......................................... 19

            1.    The meaning of the statutory text is clear ................. 20

            2.    The legislative history confirms the plain
                  meaning of the text ....................................................... 27

      B.    CBP's Regulation and Preamble Are Not Reasonable
            to the Extent They Contradict the Plain Meaning of
            the CDSOA .......................................................................... 30

III.  CBP'S READING OF THE CDSOA IS NOT ENTITLED
TO DEFERENCE .......................................................................... 34

      A.    CBP's Reading Is Contained Only in the Preamble ............. 35

      B.    The Preamble Is Not Entitled to *Chevron* Deference ........... 36

      C.    The Preamble Is Not Entitled to Deference Under
            *Auer* .................................................................................... 44

      D.    Deferring to CBP's Faulty Reading Would License
            Agency Overreach ................................................................ 49

REQUEST FOR RECONSIDERATION ................................................. 50

I.     PRIOR RULING ............................................................................. 52

II.    REASONS FOR RECONSIDERATION ....................................... 53

CONCLUSION ........................................................................................ 57

CERTIFICATE OF COMPLIANCE WITH THE COURT OF INTERNATIONAL TRADE'S STANDARD CHAMBERS PROCEDURES

CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

# TABLE OF AUTHORITIES

## Cases

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
  995 F.2d 1106 (D.C. Cir. 1993) ........................................................... 56

*Aqua Prods., Inc. v. Matal*,
  872 F.3d 1290 (Fed. Cir. 2017) .......................................................... 40

*Auer v. Robbins*,
  519 U.S. 452 (1997) ............................................................... 3, 44, 47

*BedRoc Ltd., LLC v. United States*,
  541 U.S. 176 (2004) ........................................................................ 26

*Bell Atl. Tel. Cos. v. FCC*,
  131 F.3d 1044 (D.C. Cir. 1997) .......................................................... 20

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988) ........................................................................ 47

*Bowles v. Seminole Rock & Sand Co.*,
  325 U.S. 410 (1945) ........................................................................ 44

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ........................................................................ 43

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
  566 U.S. 399 (2012) ........................................................................ 20

*Catawba Cty. v. EPA*,
  571 F.3d 20 (D.C. Cir. 2009) ............................................................. 30

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ........................................................... 16, 18, 19, 20

*Christensen v. Harris Cty.*,
  529 U.S. 576 (2000) ............................................................... 36, 39, 44

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012) ........................................................................ 47

*City of Arlington v. FCC,*
  569 U.S. 290 (2013) ............................................................ 16, 19, 36

*Colacicco v. Apotex Inc.,*
  521 F.3d 253 (3d Cir. 2008), *cert. granted, judgment vacated*
  *on other grounds*, 556 U.S. 1101 (2009) ............................................. 40

*DAK Americas LLC v. United States,*
  422 F. Supp. 3d 1372 (Ct. Int'l Trade 2019) ...................................... 15

*Decker v. Nw. Envtl. Def. Ctr.,*
  568 U.S. 597 (2013) ....................................................................... 49

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) .................................................................. 44

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ....................................................................... 33

*Eagle Pharm., Inc. v. Azar,*
  952 F.3d 323 (D.C. Cir. 2020) ......................................................... 45

*Electrolux Holdings, Inc. v. United States,*
  491 F.3d 1327 (Fed. Cir. 2007) ................................................... 20, 26

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016) .............................................................. 41, 43

*Engine Mfrs. Ass'n* ........................................................................ 46

*Engine Mfrs. Ass'n v. EPA,*
  88 F.3d 1075 (D.C. Cir. 1996) ......................................................... 21

*Entergy Corp. v. Riverkeeper, Inc.,*
  556 U.S. 208 (2009) ....................................................................... 18

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ....................................................................... 17

*Fla. Power & Light Co. v. United States,*
  846 F.2d 765 (D.C. Cir. 1988) ......................................................... 55

iv

*FTC v. Mandel Bros., Inc.*,
    359 U.S. 385 (1959) ........................................................................ 26

*Gardner v. State of N.J.*,
    329 U.S. 565 (1947) ........................................................................ 22

*GHS Health Maint. Org., Inc. v. United States*,
    536 F.3d 1293 (Fed. Cir. 2008) .................................................. 31, 33

*Hecker v. Deere & Co.*,
    569 F.3d 708 (7th Cir. 2009) ........................................................ 40

*Holmes v. Jennison*,
    39 U.S. 540 (1840) ........................................................................ 22

*Hymas v. United States*,
    810 F.3d 1312 (Fed. Cir. 2016) .................................................... 33

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
    238 F.3d 1324 (Fed. Cir. 2001) .................................................... 57

*Int'l Union, United Mine Workers of Am.*
    *v. Mine Safety & Health Admin.*,
    626 F.3d 84 (D.C. Cir. 2010) ........................................................ 48

*K Mart Corp. v. Cartier, Inc.*,
    486 U.S. 281 (1988) ...................................................................... 25

*King v. Burwell*,
    576 U.S. 473 (2015) .................................................................. 17, 36

*Kingdomware Techs., Inc. v. United States*,
    136 S. Ct. 1969 (2016) .................................................................. 21

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) .......................................................... *passim*

*Koyo Seiko Co. v. United States*,
    36 F.3d 1565 (Fed. Cir. 1994) ...................................................... 18

*Kyocera Solar, Inc. v. U.S. Int'l Trade Comm'n*,
    844 F.3d 1334 (Fed. Cir. 2016) .................................................... 16

*Leslie Salt Co. v. United States,*
    55 F.3d 1388 (9th Cir. 1995)................................................................37

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
    523 U.S. 26 (1998)................................................................21

*Life Techs. Corp. v. Promega Corp.,*
    137 S. Ct. 734 (2017)................................................................21

*Long Island Care at Home, Ltd. v. Coke,*
    551 U.S. 158 (2007)................................................................47

*Luminant Generation Co. v. EPA,*
    675 F.3d 917 (5th Cir. 2012)........................................................38, 39

*Maine Cmty. Health Options v. United States,*
    140 S. Ct. 1308 (2020)................................................................21

*Martin v. Soc. Sec. Admin., Comm'r,*
    903 F.3d 1154 (11th Cir. 2018)................................................................17

*MCI Telecomms. Corp. v. FCC,*
    57 F.3d 1136 (D.C. Cir. 1995)................................................................55

*N.H. Hosp. Ass'n v. Azar,*
    887 F.3d 62 (1st Cir. 2018) ................................................37, 39, 41

*Nat'l Black Media Coal. v. FCC,*
    791 F.2d 1016 (2d Cir. 1986) ................................................................42

*Nat'l Family Planning & Reproductive Health Ass'n v. Sullivan,*
    979 F.2d 227 (D.C. Cir. 1992)................................................................56

*Nat'l Wildlife Fed'n v. EPA,*
    286 F.3d 554 (D.C. Cir. 2002) ................................................................32

*Nielson v. Shinseki,*
    607 F.3d 802 (Fed. Cir. 2010) ................................................................26

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n,*
    499 U.S. 117 (1991) ................................................................22

*Occidental Eng'g Co. v. INS*,
   753 F. 2d 766 (9th Cir. 1985) ............................................................. 16

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ........................................................................ 56

*Peter v. Nantkwest, Inc.*,
   140 S. Ct. 365 (2019) ................................................................... 21

*Petit v. U.S. Dep't of Educ.*,
   675 F.3d 769 (D.C. Cir. 2012) ..................................................... 20

*Prometheus Radio Project v. FCC*,
   652 F.3d 431 (3d Cir. 2011) ........................................................ 42

*PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n*,
   442 F. Supp. 2d 1329 (Ct. Int'l Trade 2006),
   *rev. and remanded on unrelated grounds*,
   684 F.3d 1374 (Fed. Cir. 2012) ................................................... 27

*Pub. Citizen v. Heckler*,
   653 F. Supp. 1229 (D.D.C. 1986) ............................................... 43

*Ragsdale v. Wolverine World Wide, Inc.*,
   535 U.S. 81 (2002) ...................................................................... 31

*Richards v. INS*,
   554 F.2d 1173 (D.C. Cir. 1977) .................................................. 16

*SAS Inst. Inc. v. Iancu*,
   138 S. Ct. 1348 (2018) ................................................................ 30

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001) .................................................. 22

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ...................................................................... 43

*Sierra Club v. Mainella*,
   459 F. Supp. 2d 76 (D.D.C. 2006) ............................................. 16

*Sinclair Wyo. Ref. Co. v. EPA,*
   887 F.3d 986 (10th Cir. 2017) .......................................................... 34, 38

*SKF USA, Inc. v. U.S. Customs & Border Prot.,*
   556 F.3d 1337 (Fed. Cir. 2009) ............................................................ 7

*Small Refiner Lead Phase-Down Task Force,*
   705 F.2d 506 (D.C. Cir. 1983) ............................................................. 42

*Soc. Sec. Bd. v. Nierotko,*
   327 U.S. 358 (1946) ............................................................................ 30

*Thomas Jefferson Univ. v. Shalala,*
   512 U.S. 504 (1994) ............................................................................ 49

*Tibble v. Edison Int'l,*
   729 F.3d 1110 (9th Cir. 2013),
   *vacated,* 575 U.S. 523 (2015) ............................................................. 40

*Time Warner Cable Inc. v. FCC,*
   729 F.3d 137 (2d Cir. 2013) ................................................................ 42

*Timex V.I., Inc. v. United States,*
   157 F.3d 879 (Fed. Cir. 1998) ............................................................ 26

*Timken Co. v. United States,*
   569 F. Supp. 65 (Ct. Int'l Trade 1983) ................................................ 51

*TiVo, Inc., v. EchoStar Corp.,*
   646 F.3d 869 (2011)............................................................................ 22

*Tung Mung Dev. Co. v. United States,*
   25 C.I.T. 752, 2001 WL 844484 (July 3, 2001).................................. 39

*Union Steel v. United States,*
   804 F. Supp. 2d 1356 (Ct. Int'l Trade 2011),
   *judgment entered,* 37 C.I.T. 1201 (2013) ........................................... 51

*United Sav. Ass'n of Tex.*
   *v. Timbers of Inwood Forest Assocs., Ltd.,*
   484 U.S. 365 (1988) ...................................................................... 25, 26

*United States v. Chem. Found., Inc.*,
   272 U.S. 1 (1926) ............................................................. 57

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ................................................... *passim*

*Util. Air Regulatory Grp. v. EPA*,
   573 U.S. 302 (2014) ......................................................... 17

*Veterans Justice Grp., LLC v. Sec'y of Veterans Affairs*,
   818 F.3d 1336 (Fed. Cir. 2016) ....................................... 48

*Vill. of Barrington v. Surface Transp. Bd.*,
   636 F.3d 650 (D.C. Cir. 2011) .................................... 20, 30

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ......................................................... 36

*Williams v. United States*,
   289 U.S. 553 (1933) ......................................................... 22

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ......................................................... 39

**Statutes, Regulations, & Rule**

5 U.S.C. § 706 ........................................................... 15, 16

19 U.S.C. § 1505 .................................................... *passim*

19 U.S.C. § 1677g ................................................. *passim*

Continued Dumping and Subsidy Offset Act of 2000,
   19 U.S.C. § 1675c ............................................... *passim*

Pub. L. No. 106-387,
   114 Stat 1549 (2000) .................................................. 27, 28

Pub. L. No. 109-171,
   120 Stat. 4 (2006) ............................................................. 1

Trade Facilitation and Trade Enforcement Act of 2015,
Pub. L. No. 114-125, 130 Stat. 122......................................................29

19 C.F.R. § 159.64(e).............................................................................*passim*

Distribution of Continued Dumping and Subsidy Offset to
Affected Domestic Producers,
66 Fed. Reg. 33,920 (June 26, 2001) ......................................10, 37, 54

Distribution of Continued Dumping and Subsidy Offset to
Affected Domestic Producers,
66 Fed. Reg. 48,546 (Sept. 21, 2001) .........................................*passim*

USCIT R. 54..............................................................................................51

**Other Authorities**

145 Cong. Rec. S497 (daily ed. Jan. 19, 1999)
(statement of Sen. DeWine)..................................................................28

146 Cong. Rec. 23,117 (2000)
(statement of Sen. Byrd)........................................................................6

146 Cong. Rec. H9,708 (daily ed. Oct. 11, 2000)
(statement of Rep. Johnson) ................................................................28

146 Cong. Rec. S10,697 (daily ed. Oct. 18, 2000)
(statement of Sen. Byrd)......................................................................28

162 Cong. Rec. S843 (daily ed. Feb 11, 2016)
(statement of Sen. Thune) ...................................................................29

3 Charles H. Koch, Jr. & Richard Murphy,
Admin. L. & Prac. (3d ed.) ..................................................................38

Oxford English Dictionary (1989) .........................................................22

Webster's Third New Int'l Dictionary (2002) ...................................24, 25

Webster's Third New International Dictionary (1981)...........................22

## INTRODUCTION

The plain text of the Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA") directs that U.S. Customs and Border Protection ("CBP") "shall distribute all funds (including *all interest earned* on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers {'ADPs'} ... ."  19 U.S.C. § 1675c(d)(3) (2000) (emphasis added) (repealed Pub. L. No. 109-171, § 7601(a), 120 Stat. 4, 154 (2006)).  Based on this clear statutory command, CBP was required to distribute all interest to ADPs, including interest under 19 U.S.C. § 1677g(a) (for underpayments deposited at the time of entry of the import) *and* delinquency interest under 19 U.S.C. § 1505(d) (which accrued for late payment of an outstanding balance of duties owed).

The recently filed Administrative Record Supplement ("ARS") shows that the agency apparently recognized this clear meaning and made preparations to distribute delinquency interest.  *See* ARS 511.  The agency changed course after publishing the proposed rule, *see* ARS 579, and the only reason given by the agency's declarant in the record for that change was the technical inability of CBP's systems to account separately for delinquency interest, *see* ARS 006.  CBP now claims in this litigation

that the statute *does not require* distribution of Section 1505 interest, and that its rule (which was drafted under the assumption that CBP *would distribute* Section 1505 interest) somehow put the public on notice that CBP was not going to distribute delinquency interest. This clearly is a made-for-litigation argument, and CBP's counter-textual reading cannot be squared with the statute or even with the text of the regulation that CBP itself promulgated. The statute is not in any way ambiguous, and Congress did not delegate to CBP any policy discretion to decide which kinds of interest to distribute. By acting contrary to the plain text of the CDSOA, CBP has exceeded the bounds of its statutory authority. That should be the end of the matter: if the statute means what it says—that is, if "all interest" in fact means all interest—then CBP's action is *ultra vires*.

As agencies with losing statutory arguments usually do, CBP will likely assert that this Court owes deference to its incorrect reading of the CDSOA. But CBP's argument is deficient in several ways. First, the Record Supplement shows that the CBP's argument is a *post-hoc* rationalization of the agency's *ultra vires* action. Second, CBP's reading hinges on the word "only" found in the preamble to the final rule, which

does not carry the force of law.  The reading based on the preamble is therefore not entitled to deference under *Chevron*.  *See United States v. Mead Corp.*, 533 U.S. 218, 226-27, 229 (2001).  Nor does the preamble warrant deference under *Auer v. Robbins*, 519 U.S. 452 (1997), as an "interpretation" of CBP's regulation.  Among other reasons, the relevant regulation—which either says that delinquency interest will be distributed or says nothing at all about delinquency interest—is not "genuinely ambiguous," *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019), in a way that allows CBP to twist the language to *exclude* delinquency interest from CDSOA distributions.

At bottom, Congress started with a clear statutory command that CBP distribute "all interest."  CBP then issued a regulation that is at most silent on delinquency interest—and certainly does not *exclude* delinquency interest.  CBP now attempts to exploit that silence to assert that it is *not* required to distribute delinquency interest, the exact opposite of what the statute says.  This Court must either reject this maneuver, or else sanction a new playbook for agency overreach.

Separately, the Court should reconsider its ruling on CBP's motion to dismiss because the Record Supplement confirms that CBP's final rule

did not put the public on notice that it would not distribute delinquency interest.  Prior to issuing the proposed rule, CBP apparently recognized that the statute required it to place delinquency interest in the special account for distribution and made plans accordingly.  *See* ARS 511. During the period between the proposed and final rule, however, there is an entry in the Record Supplement dated August 2001 memorializing CBP's decision *not* to distribute delinquency interest.  *See* ARS 579.  The only reason given in the Record Supplement for this change of course is a non-contemporaneous declaration signed in 2021 stating that CBP's systems, as a technical matter, could not separately account for delinquency interest.  *See* ARS 006.

That's a problem, because CBP's 180-degree change in course to exclude delinquency interest was not reflected in *the text of the final regulation*—the only means by which the agency can promulgate rules that affect substantive rights.  CBP also was under a duty to explain its reasoning for a course change.  After having published a proposed rule under one reading of the statute meant to distribute delinquency interest, it was incumbent on CBP as a matter of administrative law sufficiently to change the text of the rule if it intended the final rule *to*

*have the opposite meaning* of not distributing delinquency interest and to explain its reasoning.  But CBP did not do so.  CBP cannot now rely on a stray phrase in the preamble to the final rule—tucked away in an answer about a different topic—to change the substantive meaning of the rule that does not exclude delinquency interest.  Because CBP did not adequately convey its change of course, Plaintiffs lacked notice that CBP intended to withhold delinquency interest from ADPs, and therefore Plaintiffs' causes of action did not begin to accrue until 2016, when they first obtained notice that CBP was not distributing delinquency interest to ADPs.  Plaintiffs therefore respectfully request that this Court reconsider its dismissal of the claims seeking interest on distributions prior to April 18, 2015.

## RULE 56.1 STATEMENT

1.    The administrative determination to be reviewed is the CBP's decision to withhold from distribution under the CDSOA all delinquency interest accruing under 19 U.S.C. § 1505(d) that the agency collected on late payments of duties that were subject to distribution.    *See* Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 66 Fed. Reg. 48,546 (Sept. 21, 2001).

2.     Whether the CDSOA's directive that CBP "distribute all funds (including all interest earned on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers" unambiguously requires CBP to distribute collected Section 1505(d) interest that accrued on late payments of duties that were subject to distribution under the CDSOA.

3.     To the extent the CDSOA is ambiguous concerning the types of interest that CBP must distribute, whether the Court must defer to CBP's reading of the statute—which depends solely on the preamble to its final rule implementing the statute—under *Chevron* or *Auer*.

## STATEMENT OF FACTS

Congress enacted the CDSOA in October of 2000.  19 U.S.C. § 1675c.  It was designed to help injured domestic industries "recover monetarily" from "losses sustained as a result of unfair foreign trade practices."  146 Cong. Rec. 23,117 (2000) (statement of Sen. Byrd).  The CDSOA compensates domestic producers who have been injured by dumped or subsidized imports, and who had supported the investigation leading to the antidumping ("AD") or countervailing duty ("CVD") orders

covering said imports.  *SKF USA, Inc. v. U.S. Customs & Border Prot.*, 556 F.3d 1337, 1350-51 (Fed. Cir. 2009).

The CDSOA accomplishes this goal in a relatively straightforward manner.  Under the CDSOA, CBP must deposit into special accounts any duties collected under AD or CVD orders, as well as any interest earned on those duties.  *See* 19 U.S.C. § 1675c(e)(2).  After depositing these duties and the interest collected on them into the special account, CBP annually must distribute these amounts to any domestic producer that (i) was a petitioner in the investigation leading to the antidumping or countervailing duty order or (ii) expressed support for the petition during the investigation.  *Id.* § 1675c(a) & (b)(1).  Under the CDSOA, the domestic producers who are eligible to receive CDSOA distributions are known as "affected domestic producer[s]," or "ADPs."  *Id.* § 1675c(b)(1).

Two types of interest are relevant here.  First, 19 U.S.C. § 1677g authorizes CBP to collect interest on underpayments of antidumping or countervailing duties, in the event that the amount of the duty ultimately assessed at liquidation is greater than the amount deposited at the time of entry.  Interest under Section 1677g is assessed as part of the final duty owed for liquidation, and it accrues from the date of deposit to the

date of liquidation.  Second, 19 U.S.C. § 1505(d) authorizes CBP to collect delinquency interest from importers and sureties if the importer does not pay any balance owed at liquidation within 30 days.  Interest assessed under Section 1505(d) accrues on the entire balance of the outstanding bill, including the duties, the Section 1677g interest, and any taxes or fees still owed by the importer.

The CDSOA instructs CBP to deposit into special accounts and then distribute to ADPs "all interest earned" on the duties deposited in the accounts.  19 U.S.C. § 1675c(d)(3) (CBP "shall distribute all funds (including *all interest* earned on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers based on the certifications" (emphasis added)); *see also id.* § 1675c(e)(2) (CBP "shall deposit into the special accounts, all antidumping and countervailing duties (including interest earned on such duties) that are assessed after the effective date of this section under the antidumping order or finding or the countervailing duty order with respect to which the account was established").  The statute also makes clear that CBP must distribute the interest earned on "all funds" in the accounts, not merely the initial interest paid under Section 1677g.  *Id.* § 1675c(d)(3).

8

Under the plain text of this statute, there is no basis for CBP to deposit into the special accounts one type of interest but not another type. *See id*. § 1675c(d)(3).  Thus, since the beginning of the CDSOA program, CBP was required to deposit into the special accounts, and then distribute to ADPs, *all* of the interest collected from importers and sureties under existing antidumping and countervailing duty orders, including 19 U.S.C. § 1677g interest and all delinquency interest collected under 19 U.S.C. § 1505(d).

This intuitive reading of the statute was also apparent to CBP.  As of February 21, 2001, CBP was making internal "work assignments," one of which was that "OF and OIT will consider possible methods for assigning 1505 interest {i.e., delinquency interest} to specific AD/CV cases for purposes of deposit into the Clearing Account and eventual transfer into the Special Account for disbursement."  ARS 510-11.  The document noted that "the decisions and assignments stated above are based on *the current position of the agency*" connected with "the proposed rulemaking" and noted that further interagency review was pending. ARS 511 (emphasis added).

On June 26, 2001, CBP published a proposed CDSOA rule. The proposal states that "statutory interest charged on antidumping and countervailing duties at liquidation, will be transferred to the Clearing Account or Special Account, as appropriate, when collected from the importer." Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 66 Fed. Reg. 33,920, 33,926 (June 26, 2001) (proposed 19 C.F.R. § 159.64(e)). The proposed rule does not state that § 1677g interest is the only type of "statutory" interest that will be distributed under the CDSOA, nor does it exclude § 1505(d) interest from distribution. In fact, the preamble to the proposed rule suggests that delinquency interest would be distributed:

> if there is interest paid by the importer on any antidumping or countervailing duties billed in the liquidation process for the import entries, that interest will be transferred to the Clearing Account or Special Account, as appropriate.

66 Fed. Reg. at 33,922. Of course, § 1505(d) interest accrues on all "duties billed during the liquidation process for the import entries" that are not paid within 30 days. Nothing in the proposal conveyed that CBP would not distribute delinquency interest (which makes sense, as this was how CBP read the statute at this point).

10

In an August 2001 entry in the Administrative Record Supplement, a decision is noted where CBP decided *not* to make delinquency interest available for distribution. ARS 579 ("Decision has been made that accrued interest for late payment of bill will not be made available for disbursement under Byrd Amendment."). Despite this change in course, the final rule was published with a materially similar *paragraph* to the proposed rule:

> statutory interest charged on antidumping and countervailing duties at liquidation will be transferred to the Special Account, when collected from the importer.

Distribution of Continued Dumping and Subsidy Offset to Affected Domestic Producers, 66 Fed. Reg. 48,546, 48,554 (Sept. 21, 2001) (codified at 19 C.F.R. § 159.64(e)). At best, the final rule is (like the proposal) *completely silent* about delinquency interest.

Nonetheless, despite initially adopting the clear language of the statute as the "position of the agency," CBP changed course and failed to deposit delinquency interest collected under existing antidumping and countervailing duty orders into the special accounts and did not distribute this interest to ADPs. And to make matters worse, CBP also has offset the duties and Section 1677(g) interest that should have been

11

distributed to ADPs by the amounts of any unpaid delinquency interest, a practice that was never publicly published or explained.  Compl. (ECF No. 2) ¶¶ 11-16.  This practice has resulted in a further diminution of the amounts owed ADPs.

In its Motion to Dismiss, CBP argued that the reason for its decision not to distribute delinquency interest was its conclusion that the statute required it to distribute only Section 1677g interest.  (ECF No. 19) at 3-4.  But the Administrative Record Supplement says otherwise.  CBP's reason for not following the plain text of the statue was a *technical* one, not a legal one: the "technological limitations of Customs' Automated Commercial System ('ACS')" were apparently the "only reason" for "the decision to distribute only 19 U.S.C. § 1677g interest."  ARS 006.  And the record evidence suggests that decision was made *after* the proposed rule was published.  ARS 579.

Now with the aid of the supplemental record, it is apparent that CBP's statutory legal argument is a *post-hoc*, made-for-litigation legal argument attempting to cover its *technical* failings.  CBP's regulatory argument fares no better.  CBP now purports to base its unlawful practice of impounding delinquency interest on the "at liquidation" language in

the regulation, which this Court has already rejected, Opinion (ECF No 57) at 11-12, and a preamble to the final regulation. But CBP's interpretation of the preamble reads it out of context and was not a logical outgrowth of the proposed rule.

CBP hangs its hat on the stray phrase in the preamble, where CBP was answering an entirely different comment: whether the special accounts *themselves* should be made interest-bearing. In response to that comment, the preamble explains:

> {F}unds in Government accounts are not interest-bearing unless specified by Congress. Because Congress did not make an explicit provision for the accounts established under the CDSOA to be interest-bearing, no interest may accrue on these accounts. Thus, ***only*** interest charged on antidumping and countervailing duty funds themselves, pursuant to the express authority in 19 U.S.C. § 1677g, will be transferred to the special accounts and be made available for distribution under the CDSOA.

66 Fed. Reg. at 48,550 (emphasis added). The key word—and indeed, the one on which CBP's argument depends—is "only." It "is a pretty thin read {sic} to carry all that weight." May 2, 2019 H'rg Tr. (ECF No. 49) at 33.

To challenge CBP's unlawful withholding of delinquency interest, Plaintiffs filed this action, alleging that, since the beginning of the

CDSOA program, CBP has not been distributing delinquency interest to ADPs, which violates the plain text of the CDSOA.  The government moved to dismiss the action, asserting that Plaintiffs' claims were time-barred because the 2001 preamble put Plaintiffs on notice of the agency's interpretation.  After holding a hearing, this Court granted the government's motion in part, dismissing all claims except those that accrued within the two years prior Plaintiffs' filing suit.[1]  Opinion (ECF No. 57) at 20.  Notably, the Court stated that the legal effect of that preamble was not before the Court at that time.  *Id.* at 14.

Plaintiffs now file this motion for judgment on the administrative record and for reconsideration.  Because CBP's actions to withhold and offset delinquency interest violate the CDSOA and are plainly *ultra vires*, Plaintiffs are entitled to judgment on the remaining counts alleged in the complaint.[2]  Moreover, because the Administrative Record confirms that Plaintiffs lacked notice of CBP's decision to withhold delinquency interest

---

[1] Plaintiffs preserve the arguments made at the motion-to-dismiss stage for possible appeal of the partial dismissal after final judgment.

[2] If this Court grants Plaintiffs' motion for reconsideration, then Plaintiffs are entitled to judgment in their favor on those previously dismissed claims.

from ADPs, Plainitffs' claims did not begin accruing until they had such notice, in 2016. Plaintiffs respectfully request that this Court reconsider its dismissal of those claims.

## MOTION FOR JUDGMENT ON
## THE ADMINISTRATIVE RECORD

Custom's interpretation—that the government will pocket delinquency interest instead of distributing it to ADPs—is contrary to the plain text and the legislative history of the CDSOA. That is the end of the inquiry, and CBP's interpretation is *ultra vires*. Moreover, even if the statute is susceptible to multiple readings, CBP's interpretation is due no deference under either *Chevron* or *Auer*.

## I.   STANDARD OF REVIEW

"In an action brought under 28 U.S.C. § 1581(i), the court conducts its review according to the standard of review set forth in the Administrative Procedure Act ('APA'), 5 U.S.C. § 706, under which a court must hold unlawful agency action found to be ... not in accordance with law. 28 U.S.C. § 2640(e)." *DAK Americas LLC v. United States*, 422 F. Supp. 3d 1372, 1376 (Ct. Int'l Trade 2019). When administrative action is challenged, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative

record permitted the agency to make the decision it did." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F. 2d 766, 769 (9th Cir. 1985)).  Where, as here, no facts are in dispute, "Summary judgment … serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).  This Court "review{s} issues of statutory construction under the two-prong analysis announced in *Chevron*." *Kyocera Solar, Inc. v. U.S. Int'l Trade Comm'n*, 844 F.3d 1334, 1338 (Fed. Cir. 2016) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

As an initial matter, for *Chevron* to apply Congress must have entrusted an Agency with the authority to interpret the particular statute at issue, *see City of Arlington v. FCC*, 569 U.S. 290, 301 (2013),

and implicitly or explicitly given the agency the discretion to decide the question contemplated. But sometimes a question is simply too important to the statutory scheme for Congress implicitly to delegate it. *See King v. Burwell*, 576 U.S. 473, 474 (2015) (noting that "had Congress wished to assign that question to an agency, it surely would have done so expressly"); *see also Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 126, 132 (2000). Indeed, a court only can defer to an agency's statutory interpretation under *Chevron* "where Congress explicitly or implicitly 'expect{s} the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law,' and the agency actually acts in line with that expectation." *Martin v. Soc. Sec. Admin., Comm'r*, 903 F.3d 1154, 1159 (11th Cir. 2018) (per curiam) (quoting *Mead Corp.*, 533 U.S. at 229).

If the question is one that could be delegated to an agency by Congress, then the familiar inquiry proceeds in two steps. At *Chevron* step one, the court asks "whether Congress has directly spoken to the precise question at issue," and if it has, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously

expressed intent of Congress." *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (quoting 467 U.S. at 842-43).  If, however, the statute does not answer the question at hand, because it is "silent or ambiguous," then, under *Chevron* step two, the court determines whether the agency provided "a permissible construction of the statute."  *Id.* (quoting 467 U.S. at 842-43).

Where, as here, there is a clear and unambiguous statutory directive, the two steps of *Chevron* collapse into one.  *See Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 n.4 (2009) (embracing single-step analysis because "if Congress has directly spoken to an issue then any agency interpretation contradicting what Congress has said would be unreasonable").  Moreover, an interpretation advanced only in an agency document that lacks the force of law—like a preamble—is not entitled to deference in the first place.  *See Mead Corp.*, 533 U.S. at 226-27.

## II.   THE   CDSOA   REQUIRES   CBP   TO   DISBURSE DELINQUENCY INTEREST TO AFFECTED DOMESTIC PRODUCERS.

The CDSOA tells CBP exactly what to do with "all interest," including delinquency interest: CBP must "deposit" it "into the special accounts," and then must "distribute" it "to affected domestic producers."

*Id.* § 1675c(d)(3), (e)(2).   CBP's contrary position—that it can instead remit delinquency interest to the Treasury—is plainly contrary to the clear terms of the CDSOA.   Alternatively, it is an unreasonable interpretation of the CDSOA.

### A.   Congress Unambiguously Directed CBP to Distribute Delinquency Interest.

The text of the CDSOA is clear, and CBP cannot avoid its plain meaning.   The CDSOA directs that CBP "shall distribute *all* funds (including *all interest* earned on the funds) from assessed duties received in the preceding fiscal year to affected domestic producers based on the certifications."   *Id.* § 1675c(d)(3) (emphasis added); *see also id.* § 1675c(e)(2) (CBP "shall deposit into the special accounts, *all* antidumping and countervailing duties (including interest earned on such duties)" (emphasis added)).   The meaning is plain: both Section 1677g interest and Section 1505(d) delinquency interest must be deposited and later distributed.

Courts apply "the ordinary tools of statutory construction" to "determine 'whether Congress has directly spoken to the precise question at issue.'" *City of Arlington*, 569 U.S. at 296 (quoting *Chevron*, 467 U.S. at 842).   These tools include "examination of the statute's text, legislative

history, and structure, as well as its purpose." *Petit v. U.S. Dep't of Educ.*, 675 F.3d 769, 781 (D.C. Cir. 2012) (quoting *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997)).  The court interprets the statute for itself, without regard to whether CBP believes it to be ambiguous. *See Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 659-60 (D.C. Cir. 2011) ("Because at *Chevron* step one we alone are tasked with determining Congress's unambiguous intent, we answer {the step-one question} without showing the agency any special deference.").  If, after this analysis "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

### 1.    *The meaning of the statutory text is clear.*

The inquiry here begins "where all such inquiries must begin: with the language of the statute itself." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012) (internal quotation marks omitted); *see also Electrolux Holdings, Inc. v. United States*, 491 F.3d 1327, 1330 (Fed. Cir. 2007) ("Statutory interpretation begins with the language of the statute.  We derive the plain meaning of the statute from its text and structure." (citation omitted)); *Engine Mfrs. Ass'n v. EPA*, 88

F.3d 1075, 1088 (D.C. Cir. 1996) ("The most traditional tool, of course, is to read the text.").

First, the statute imposes a mandatory, binding obligation on CBP. The word "shall" is "mandatory" and "normally creates an obligation impervious to judicial discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998); *see also Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("Unlike the word may, which implies discretion, the word shall usually connotes a requirement." (quoting *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016))).  Because the statute is mandatory, it is plainly *ultra vires* for CBP to do anything other than what the statute directs.

That mandatory direction is that CBP deposit into the special accounts and distribute to ADPs "all interest."  "{T}he modifier 'all' … conveys breadth." *Peter v. Nantkwest, Inc.*, 140 S. Ct. 365, 372 (2019). As the Supreme Court recently held, "'{a}ll' means the entire quantity, without reference to relative importance." *Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 740 (2017).  To arrive at this conclusion, the Court relied on two dictionaries: Webster's Third New International Dictionary, which defines "all" as "that is the whole amount or quantity of," or "every

member or individual component of," or "the whole number or sum of," *id*. at 54 (1981) (defs. 1a, 2a, 3); and the Oxford English Dictionary, which defines it as "{t}he entire number of; the individual components of, without exception," *id*., Vol. 1 at 324 (1989) (def. 2).  "The use of the word 'all' … cannot be regarded as accidental," *Williams v. United States*, 289 U.S. 553, 572 (1933) (citing *Holmes v. Jennison*, 39 U.S. 540, 570-71 (1840)), and there's no reason to think that Congress meant here for the word "all" to carry anything but its ordinary meaning.

As one would expect, the Supreme Court and the Federal Circuit routinely hold that the word "all" in fact means all.  *Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991) ("By itself, the phrase 'all other law' indicates no limitation."); *Gardner v. State of N.J.*, 329 U.S. 565, 573 (1947) ("The words 'all holders of claims' have no qualification and are sufficiently broad to include public agencies as well as private parties."); *TiVo, Inc., v. EchoStar Corp.*, 646 F.3d 869, 889 (2011) ("Plainly, the word 'all' refers to *all* DVR functionality, infringing or not."); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001) ("The words 'all embodiments of the present invention' are broad and unequivocal.  It is difficult to imagine

how the patents could have been clearer in making the point."). Because the statute covers "all interest," and because delinquency interest is obviously a type of interest, the statute unambiguously requires CBP to deposit delinquency interest in the special accounts and then distribute it to ADPs.

In its motion to dismiss, CBP made two made-for-litigation, *post-hoc* arguments about why "all interest" does not include delinquency interest. CBP argued that the statute could not include delinquency interest because Section 1675c requires CBP to distribute interest "from assessed duties," (d)(3), that is assessed "under" the applicable AD or CVD order, (e)(2). Gov't MTD (ECF No. 19) at 3 & n.2. CBP apparently thinks these restrictions mean that only interest that can be calculated at liquidation (*i.e.*, Section 1677g interest) is "from assessed duties" or "under" the applicable AD or CVD order such that it must be deposited in the special accounts and ultimately distributed to ADPs.

But the Administrative Record Supplement shows that even CBP did not buy this argument (at least until its technical inabilities forced its hand). The only reason CBP decided not to distribute delinquency interest was based on a technical limitation, not a textual analysis of the

23

statute. *See* ARS 006. And the agency initially planned to distribute delinquency interest, which arose from the "position of the agency" at the time. ARS 511. There is no evidence in the Record that shows that CBP relied on its new-found statutory legal theory in making its decision.

In any case, the statutory language does not support CBP's made-for-litigation legal arguments. According to Section 1675c(d)(3), CBP "shall distribute all funds (including all interest earned on the funds) from assessed duties" to ADPs. When used this way, the preposition "from" is used to indicate the source or reason for something. *See* Webster's Third New Int'l Dictionary 913 (2002) (def. 3) (the "source, cause, means, or ultimate agent" or the "ground, reason, or basis" of an action). Delinquency interest accrues on the outstanding balance of assessed duties—it would not accrue if those duties were never assessed—and it therefore comes "from assessed duties" just as Section 1677g interest does. Delinquency interest is "interest earned on the {AD and CVD} funds," Section 1675c(d)(3), and there is no reason for CBP to exclude such interest.

The government's Section 1675c(e)(2) argument, based only on the word "under," is similarly misplaced. That section instructs CBP to

24

"deposit into the special accounts, all antidumping and countervailing duties (including interest earned on such duties) that are assessed … under the antidumping order or finding or the countervailing duty order." Used this way, the preposition "under" means "required by" or "in accordance with." *See* Webster's Third New Int'l Dictionary 2487 (2002) (def. 8a). Because an importer would never have to pay delinquency interest but for the AD or CVD order, delinquency interest is "required by," or is assessed "in accordance with" that order. In any event, delinquency interest unquestionably is "interest earned on" the "antidumping and countervailing duties," and therefore must be deposited into the special accounts under the plain meaning of Section 1675c(e)(2).

And if there were any doubt, context settles it. "Statutory construction … is a holistic endeavor," *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988), and courts must read statutes in light of "the language and design of the statute as a whole," *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Here, CBP's strained reading of Section 1675c(e)(2) is incompatible with the plain meaning of Section 1675c(d)(3), which clearly

states that *all* interest must be distributed to ADPs.  The modifier "all"

refers to multiple kinds of interest.   *See supra* at 16-17.   Because

Section 1675c(e)(2) does not state that *only* interest assessed "under" the

AD and CVD order can be put in the special accounts, these provisions

should be read in harmony.  *See Nielson v. Shinseki*, 607 F.3d 802, 807

(Fed. Cir. 2010) ("A court must ... 'fit, if possible, all parts {of a statute}

into a harmonious whole.'" (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S.

385, 389 (1959))).  Because "only one of the permissible meanings

produces a substantive effect that is compatible with the rest of the law,"

the government's reading fails.   *United Sav. Ass'n of Tex.*, 484 U.S. at

371.

The plain meaning of the text is clear, so that is the end of the

matter.  *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 177 (2004)

("The inquiry begins with the statutory text, and ends there as the text

is unambiguous.").  "Because a statute's text is Congress's final

expression of its intent, if the text answers the question, that is the end

of the matter."  *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed.

Cir. 1998); *see also Electrolux Holdings*, 491 F.3d at 1330 ("If the

language of the statute is clear and its meaning unambiguous, that is the

end of our inquiry.  The plain meaning is conclusive." (citation omitted)).

Reading the statute as a whole confirms that ADPs are entitled to

delinquency interest.

### 2. *The legislative history confirms the plain meaning of the text.*

Although "the {CDSOA} was approved without any significant

Congressional debate or analysis, resulting in limited legislative history,"

*PS Chez Sidney, L.L.C. v. U.S. Int'l Trade Comm'n*, 442 F. Supp. 2d 1329,

1339 n.21 (Ct. Int'l Trade 2006), *rev. and remanded on unrelated grounds*,

684 F.3d 1374 (Fed. Cir. 2012), the history that does exists unequivocally

suggests that ADPs are entitled to delinquency interest.

The congressional findings in support of the law state that the

CDSOA was intended to "strengthen[]" the "United States unfair trade

laws," in order to lessen the financial "injury to domestic industries."

Pub. L. No. 106-387, § 1002, 114 Stat 1549, 1549A-72-73 (2000).

Congress expressed particular concern that:

> {D}omestic producers will be reluctant to reinvest or rehire and may be unable to maintain pension and health care benefits that conditions of fair trade would permit.  Similarly, small businesses and American farmers and ranchers may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable.

*Id.* Because Congress was concerned with the financial condition of producers, rather than the Treasury, it makes sense that it the CDSOA would require CBP to distribute delinquency interest to ADPs.

Floor statements confirm this conclusion. According to Senator Mike DeWine, who sponsored the predecessor version of the CDSOA, the bill was expressly designed to shift money from the Treasury to industry members: "Currently, revenues raised through import duties and fines go to the U.S. Treasury. Under our bill, *duties and fines would be transferred to injured U.S. companies* as compensation for damages caused by dumping or subsidization." 145 Cong. Rec. S497 (daily ed. Jan. 19, 1999) (statement of Sen. DeWine) (emphasis added). Statements of Representative Nancy Johnson of Connecticut, and Senator Robert Byrd of West Virginia, who introduced the version of the CDSOA that was eventually passed, likewise support this conclusion. 146 Cong. Rec. H9,708 (daily ed. Oct. 11, 2000) (statement of Rep. Johnson) ("The amendment ... would reduce the adverse effect of continued dumping or subsidization *by distributing the monies finally assessed to the injured industry*" (emphasis added)), 146 Cong. Rec. S10,697 (daily ed. Oct. 18, 2000) (statement of Sen. Byrd) (explaining the bill gives ADPs a "means

to recover from the losses resulting from {foreign anticompetitive} actions."

On February 24, 2016, Congress passed the Trade Facilitation and Trade Enforcement Act of 2015 ("TFTEA"), Pub. L. No. 114-125, 130 Stat. 122. The legislative history of TFTEA makes clear that members of Congress were surprised—to say the least—when they learned that CBP had not included delinquency interest in its CDSOA distributions. Indeed, on February 2016, Senator John Thune stated on the floor of the Senate:

> Duties collected on dumped imports and all interest on those duties from 2000 to 2007 were intended to be paid to the injured domestic producers to allow them to reinvest and rebuild. For reasons that defy simple explanation, CBP *ignored the direction of the statute to pay all interest to producer*s and instead deducted some types of interest from payments to producers ... *This practice defies the plain language of the statute* and cost domestic producers tens of millions of dollars over the years.

162 Cong. Rec. S843 (daily ed. Feb 11, 2016) (emphasis added). As a result, Senator Thune explained the TFTEA was enacted to "correct CBP's misreading of the law." *Id.* Thus, TFTFA made clear what Congress intended all along: That delinquency interest would be distributed to ADPs under the CDSOA.

Principally through the plain text of the CDSOA, but also through legislative history, "Congress has 'unambiguously foreclosed the agency's statutory interpretation.'" *Vill. of Barrington*, 636 F.3d at 659 (quoting *Catawba Cty. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009) (per curiam)). CBP's contrary reading, therefore, fails.

**B.    CBP's Regulation and Preamble Are Not Reasonable to the Extent They Contradict the Plain Meaning of the CDSOA.**

Because Congress has clearly spoken, any contrary reading is necessarily unreasonable. Given the clear meaning of the statute requiring all interest to be deposited into the special accounts and later distributed, CBP was not given any authority by Congress to diminish the basis of the distributions by regulation. Simply put, there is no statutory gap for CBP to fill, and no ambiguity for it to resolve: "{w}here a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer." *SAS Inst. Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018) (citing *Soc. Sec. Bd. v. Nierotko*, 327 U.S. 358, 369 (1946)). Agency interpretations—whether in a regulation or a preamble—simply cannot override the statute.

30

In any event, the actual text of the *regulation* does not conflict with the statute. The final regulation, which is materially similar to the proposal, reads:

> statutory interest charged on antidumping and countervailing duties at liquidation will be transferred to the Special Account, when collected from the importer.

19 C.F.R. § 159.64(e). The regulation is consistent with the statute, because it does not say that *only* 1677g interest will be transferred to the special account (the word "only," the lynchpin of CBP's position, comes from the preamble). The regulation does not exclude delinquency interest. Such a reading is in harmony with the statute's independent duty also to transfer delinquency interest to special account. While CBP maintains that "at liquidation" can mean only 1677g interest, this Court has already rejected the idea that the phrase standing alone conveys that meaning. Opinion (ECF No. 57) at 11-12. In any event, a regulation (and especially not regulatory silence) cannot overcome the plain meaning of a statute as a matter of law. *See GHS Health Maint. Org., Inc. v. United States*, 536 F.3d 1293, 1297 (Fed. Cir. 2008) ("When a regulation directly contradicts a statute, the regulation must yield." (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002))).

Due to the fact that the phrase "at liquidation" does not exclude delinquency interest, Opinion (ECF No. 57) at 11-12, CBP must rely on the preamble to argue that *only* 1677g interest will be distributed. The preamble to the final regulation states:

> {F}unds in Government accounts are not interest bearing unless specified by Congress. Because Congress did not make an explicit provision for the accounts established under the CDSOA to be interest-bearing, no interest may accrue on these accounts. Thus, ***only*** interest charged on antidumping and countervailing duty funds themselves, pursuant to the express authority in 19 U.S.C. § 1677g, will be transferred to the special accounts and be made available for distribution under the CDSOA.

66 Fed. Reg. at 48,550 (emphasis added). Setting aside Plaintiffs' argument that this preamble does not say what CBP thinks it does,[3] the preamble cannot carry the weight CBP gives it. It is uncontroversial that preambles are not legally binding. *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 569-70 (D.C. Cir. 2002) (per curiam). Perhaps a preamble could, in

---

[3] In its order dismissing in part and denying dismissal in part, this Court noted that the *legal effect* of the preamble had yet to be decided. Opinion (ECF No. 57) at 14 ("Whether the preamble had the force of law as a binding regulation is not the issue before the court ..."). Through this briefing, the issue is now squarely before the court. Plaintiffs preserve for appeal their view that the preamble does not mean what CBP says it means. *See* Resp. in Opp. (ECF No. 25) at 6-7, 15-18.

some cases, serve to *clarify* a rule, but a preamble cannot *change* the rule (and moreover cannot put the public on notice of such a change).

Nor can "a preamble … overcome the statute's plain language." *Hymas v. United States*, 810 F.3d 1312, 1323 (Fed. Cir. 2016); *cf. District of Columbia v. Heller*, 554 U.S. 570, 578 n.3 (2008) ("{I}n America the settled principle of law is that the preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms." (internal quotation marks omitted)).  And it is clear that CBP is using the preamble to change the meaning of the regulation because the proposed rule was written based on the agency's position at the time of distributing delinquency interest.  *See* ARS 511.  An August 2001 entry in the Administrative Record Supplement notes a decision to change that position, *see* ARS 579, but CBP did not make a sufficient change to the language of the rule itself to *exclude* delinquency interest, instead it now relies on a phrase in the preamble that cannot overcome the meaning of the regulatory text.

And it would make even less sense to allow a preamble to a *regulation* to overcome the plain meaning of the *statute*.  Moreover, if a regulation itself is invalid if it contradicts a statute, *see GHS Health*, 536

F.3d at 1297, then a preamble to a regulation is also invalid when it contravenes the statute.  If CBP is correct in its reading of the preamble, then the preamble is a legal nullity.

## III.  CBP'S READING OF THE CDSOA IS NOT ENTITLED TO DEFERENCE.

As discussed above, CBP's reading of the CDSOA hinges on giving the preamble *dispositive weight* (*i.e.*, adding the limitation of "only" to the regulation), but regulatory preambles are not entitled to deference.  *Mead Corp.*, 533 U.S. at 229.  Under the court-created framework of deference to agency interpretations, CBP is not permitted to receive deference for its adoption of a reading of the statute that is merely reasonable or permissible (as opposed to correct) if that reading relies on the preamble. There is "no thumb on the scale of judicial deference," *Sinclair Wyo. Ref. Co. v. EPA*, 887 F.3d 986, 991 (10th Cir. 2017), in favor of CBP's (incorrect) reading of the CDSOA based on a stray phrase in a preamble. Because the Court owes no deference to CBP's reading, this Court must determine for itself the best reading of the statute.  And as explained in the preceding section, Plaintiffs' reading of the statute is more faithful to the text and is, therefore, the correct one.

## A.      CBP's Reading Is Contained Only in the Preamble.

As this Court previously has noted, the regulation standing alone (*i.e.*, without the preamble) does not support the government's position: "{T}hat the regulation itself does not say that only duties—interest on duties that is assessed at liquidation, will be put into the special accounts.  It does say that that interest will go in the special accounts, but not only that {interest}."  May 2, 2019 H'rg Tr. (ECF No. 49) at 6:13-17.  The Court acknowledged that, for CBP to prevail, the Court must "look[] ... at the preamble," *id.* at 18-20, and that, "if the preamble didn't exist, I would be inclined to agree with you that that reg isn't very clear on this point."  *Id.* at 78:6-8.  Thus, the preamble "carr{ies} all th{e} weight."  *Id.* at 33:4-5.  This makes sense given the agency's failure adequately to change the text of the rule (or, if they had changed it, to explain that change) in order to account for the change of course between the proposed rule and final rule.  *Compare* ARS 511 *with* ARS 579.

Because the preamble carries all the weight of CBP's argument, even if the Court afforded CBP's *regulation* deference, it would buy the government precious little.  The regulation stops short of affirmatively *excluding* delinquency interest.  *See* Opinion (ECF No. 57) at 11.  As a

result, there is nothing to which the Court can give deference in the regulation that would be helpful to CBP's position. *See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("Of course, the framework of deference set forth in *Chevron* does apply to an agency interpretation contained in a regulation. But in this case the Department of Labor's regulation does not address the issue."). After all, in its opinion the Court rejected CBP's argument that the "at liquidation" language in the final regulation on its own excluded delinquency interest. Opinion (ECF No. 57) at 11-12.

## B.   The Preamble Is Not Entitled to *Chevron* Deference.

The preamble is not eligible for *Chevron* deference even if there were an implicit delegation of authority that would have allowed CBP to omit delinquency interest (and there was not).[4]  The preamble was not

---

[4] Such a decision, which goes to the heart of the program (and in fact undermines it), is not the kind of decision Congress implicitly would have delegated to CBP. *King*, 135 S. Ct. at 2487 (noting that "had Congress wished to assign that question to an agency, it surely would have done so expressly"). "{W}here Congress has established an ambiguous line, {an} agency can go no further than the ambiguity will fairly allow." *City of Arlington*, 569 U.S.at 307.  Courts therefore must reject an agency's action that "go{es} over the edge of reasonable interpretation" and "completely nullifies textually applicable provisions meant to limit {the agency's} discretion." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001).

promulgated through notice-and-comment rulemaking, and it does not carry the force of law. Courts routinely decline to grant deference to regulatory preambles. Finally, CBP's newfound position, which gives dispositive weight to a stray word in the preamble, was driven by CBP's technical inability to distribute delinquency interest to ADPs, ARS 006, rather than its faithful reading of the statute, and is therefore pretextual.

*First*, Preambles do not warrant *Chevron* deference. *Chevron* applies most clearly to interpretations developed through the "process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." *Mead Corp.*, 533 U.S. at 229. Here, the preamble was not subject to notice and comment. *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 76 (1st Cir. 2018) ("Although the 2008 regulation was subject to notice and comment, the preamble … was not."); *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir. 1995) ("It is undisputed that the preamble has not been subjected to notice and comment."). The Record Supplement now shows that the agency changed its position after the publication of the proposed rule. *Compare* ARS 511 *with* 579. Because the relevant text of the preamble appeared only in the final rule, rather than the proposal, *compare* 66 Fed. Reg. at 33,920 (proposal), *with*

66 Fed. Reg. at 48,550 (final), the public had no notice of it and could not have commented on it, even if it had wanted to.  CBP therefore cannot invoke the "'safe harbor of *Chevron* deference' for agency interpretations produced via formal agency action." *Sinclair Wyo. Ref. Co.*, 887 F.3d at 991 (quoting 3 Charles H. Koch, Jr. & Richard Murphy, Admin. L. & Prac. § 10:12 (3d ed.)).

Moreover, the preamble lacks the force of law.[5]  Under *Mead*, "[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was *promulgated* in the exercise of that authority."  *Mead Corp.*, 533 U.S. at 226-27 (emphasis added).  For example, the Fifth Circuit declined to grant *Chevron* deference to a preamble "because, by its own terms, it does not carry the force of law." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 931 (5th Cir. 2012).

---

[5] In any event, Plaintiffs preserve for possible appeal all arguments made in their opposition to dismissal and supplemental brief as to why the preamble is legally null and void and should not be considered at all.  *See* Supp. Br. (ECF No. 50) at 2, 7-9, 14-15.

38

Rather, the preamble is merely the equivalent of a policy statement. *See Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752, 2001 WL 844484, at \*13 (July 3, 2001) (internal quotation marks omitted) ("The Preamble, although it was issued after the notice-and-comment rulemaking procedure that went into 19 C.F.R. § 351.107, is a policy statement, and not an agency interpretation that holds the 'force of law.'").  It is well established that "interpretations contained in policy statements … which lack the force of law—do not warrant *Chevron*-style deference." *Christensen*, 529 U.S. at 587.  Put simply, "'interpretations contained in policy statements'" are "beyond the *Chevron* pale." *Mead Corp.*, 533 U.S. at 234.

For these reasons, courts—including the Supreme Court—do not defer to interpretations contained only in preambles.  For example, in *Wyeth v. Levine*, 555 U.S. 555, 577 (2009), the Supreme Court held that "the FDA's 2006 preamble does not merit deference" under even *Skidmore*.  The Courts of Appeals generally agree.  *See N.H. Hosp. Ass'n*, 887 F.3d at 76; *Luminant Generation*, 675 F.3d at 931 ("We do not owe *Chevron* deference to the General Preamble because, by its own terms, it does not carry the force of law."); *Hecker v. Deere & Co.*, 569 F.3d 708,

710 (7th Cir. 2009) ("{W}e cannot agree with the Secretary that the footnote in the preamble is entitled to full *Chevron* deference."); *Colacicco v. Apotex Inc.*, 521 F.3d 253, 274 (3d Cir. 2008) (declining to defer under *Chevron* to preamble), *cert. granted, judgment vacated on other grounds*, 556 U.S. 1101 (2009).[6]

Moreover, the CDSOA restricts CBP to exercising its authority "by regulation."   19 U.S.C. § 1675c(e)(3).   As the Federal Circuit recently held, "where a statute delegates to the Director the authority *to prescribe regulations* adopting standards, only notice and comment rulemaking by regulation will be given *Chevron* deference."   *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1332 (Fed. Cir. 2017) (en banc) (Moore, J., concurring) (stating the holding of a majority of the judges) (emphasis in original). Because the standards the PTO sought to enforce in that case were not contained within its regulations, the Court held that *Chevron* deference was not warranted.  *Id.*  at 1332. The same is true here, where CBP bases its reading on the preamble, not the text of the regulation.

---

[6] Although the Ninth Circuit has held to the contrary, its opinion has since been vacated, *Tibble v. Edison Int'l*, 729 F.3d 1110, 1123 (9th Cir. 2013), *vacated*, 575 U.S. 523 (2015), and it is otherwise unpersuasive for the reasons explained in this section.

**Second**, deference is not warranted, because the preamble is procedurally defective. "*Chevron* deference is not warranted where the regulation is 'procedurally defective'—that is, where the agency errs by failing to follow the correct procedures in issuing the regulation." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *Mead Corp.*, 533 U.S. at 227). Here, as this Court has recognized, the preamble goes beyond the text of the regulation. May 2, 2019 H'rg Tr. (ECF No. 49) at 6:13-17, 78:6-8. As the First Circuit explained, "Because the adoption of a substantive policy in a preamble added to a regulation after notice and comment is procedurally improper, such a policy cannot be the source of an interpretation to which a court defers." *N.H. Hosp. Ass'n*, 887 F.3d at 76 (citations omitted). The record in this case further supports this conclusion because CBP changed its position on delinquency interest but communicated that change, if at all, only in the preamble.

It is a basic tenant of administrative law that the public must be apprised of the potential policy changes in a rule and be allowed to comment on those changes. As the Second Circuit has observed, an agency must "describe the range of alternatives being considered with reasonable specificity." *Time Warner Cable Inc. v. FCC*, 729 F.3d 137,

41

170 (2d Cir. 2013) (quoting *Prometheus Radio Project v. FCC*, 652 F.3d 431, 450 (3d Cir. 2011)); *see also Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1023 (2d Cir. 1986) ("Unfairness results unless persons are sufficiently alerted to likely alternatives so that they know whether their interests are at stake." (internal quotation marks and alterations omitted)); *Small Refiner Lead Phase-Down Task Force*, 705 F.2d 506, 549 (D.C. Cir. 1983), *as amended* (July 6, 1983) (per curiam) ("Agency notice must describe the range of alternatives being considered with reasonable specificity."). That opportunity was not given here because when the proposed rule was published, everyone including the CBP itself was expecting delinquency interest to be distributed.  As such, the preamble is legally void because it was not properly promulgated as the public did not have adequate notice to comment on CBP's change in course.

   ***Third (and finally)***, even if preamble were sometimes eligible for deference, this one is not.  CBP admits that its decision not to distribute delinquency interest was driven by "technological limitations," rather than its reading of the Byrd Amendment.  *See* AR 006.  Moreover, in a 2016 correspondence with Senators Charles Grassley and John Thune, then-Commissioner Kerlikowske confirmed that the reason CBP had not

been distributing delinquency interest to ADPs was because CBP's accounting system would not allow CBP to do so. *See* Ex. 2 to Mot. to Correct the Record (ECF No. 67-2).

CBP's legal justification is the very definition of pretext. Pretextual agency action is arbitrary and capricious. *See Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986) ("For an agency to say one thing—that all raw milk is a known public health risk, and do another—refuse to ban all types of raw milk, is the essence of arbitrary action. It indicates that the Secretary's stated reason may very well be pretextual." (citation omitted)). And arbitrary and capricious agency action is due no deference. *Encino Motorcars*, 136 S. Ct. at 2126 ("An arbitrary and capricious regulation of this sort is itself unlawful and receives no *Chevron* deference."). Nor did CBP explain why it had made a change, which contravenes the requirement that an agency must "disclose the basis" of its action. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-69 (1962) (internal quotation marks omitted); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("{T}he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted by clearly disclosed and adequately

43

sustained."). And "{i}f judicial review is to be more than an empty ritual, it must demand something better" than an "explanation … for {an} action that is incongruent with what the record reveals." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019); *see also id.* ("Accepting contrived reasons would defeat the purpose of {judicial review}."). CBP's judgment about what the statute and regulation mean simply cannot receive any deference if it has offered only pretextual reasoning.

## C.    The Preamble Is Not Entitled to Deference Under *Auer*.

The preamble also is not entitled to deference as CBP's reading of its own regulation under *Auer v. Robbins*, 519 U.S. 452 (1997), and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945). Under those cases, when "the meaning of {a regulation} is in doubt," the agency's interpretation "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles*, 325 U.S. at 414. But where, as here, the agency's position bears no relationship to the regulation (or the statute) from which it ostensibly is derived, "{t}o defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, *to create de facto a new regulation*." *Christensen*, 529 U.S. at 588 (emphasis added).

*First*, because the regulation at issue here is not ambiguous, deference is not warranted.  The Supreme Court's recent decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), is dispositive on this issue.  "{A} court should not afford *Auer* deference unless the regulation is genuinely ambiguous," *id*. at 2415, which is simply not the case here.   The regulation is in fact not ambiguous at all because it does not affirmatively exclude delinquency interest.  Opinion (ECF No. 57) at 11.  As noted above, the regulation speaks only of "statutory interest charged on antidumping and countervailing duties at liquidation will be transferred to the Special Account, when collected from the importer."   19 C.F.R. § 159.64(e).  At best, the regulation is silent on delinquency interest, and certainly does not *exclude* delinquency interest.  With the regulation silent on delinquency interest, CBP is still independently required by the statute to deposit and distribute delinquency interest.

CBP will likely argue the regulation's silence about delinquency interest is an ambiguity that it is entitled to interpret under *Auer*.  Not so.  Silence does not necessarily create ambiguity.  *See Eagle Pharm., Inc. v. Azar*, 952 F.3d 323, 325 (D.C. Cir. 2020) ("If the text 'clearly requires a particular outcome, then the mere fact that it does so implicitly rather

than expressly does not mean that it is silent in the *Chevron* sense.'" (quoting *Engine Mfrs. Ass'n*, 88 F.3d at 1088)).  *Eagle* makes it clear that a statute need not affirmatively address every latent uncertainty to be unambiguous for *Chevron* purposes.  (And there's no reason why that same reasoning would not carry over to *Auer*.)

Even under CBP's newly found reading, the regulation is not ambiguous.    Rather,   although   CBP   posits   that   the   regulation unambiguously covers Section 1677g interest through the "at liquidation" language, the regulation *still* says nothing about delinquency interest as recognized by this Court.  Opinion (ECF No. 57) at 11-12.  Because the regulation stops short of excluding delinquency interest, "uncertainty does not exist," and "there is no plausible reason for deference."  *Kisor,* 139 S. Ct. at 2415.  Thus, "{t}he regulation then just means what it means—and the court must give it effect, as the court would any law." *Id.*  Here, that means requiring CBP to return to its early 2001 "position," ARS 511, and follow the statute and distribute delinquency interest to ADPs.

**Second**, "an agency's reading of a rule must reflect 'fair and considered judgment' to receive *Auer* deference."  *Kisor*, 139 S. Ct. at

2417.  Here, no memoranda support CBP's new-found legal position in the record.  Instead, the Administrative Record Supplement contains a declaration that states that the only reason known to the declarant for the change was a technical deficiency in CBP's system.  *See* ARS 006.  It is therefore apparent that CBP's legal arguments about why it is entitled to withhold delinquency interest from ADPs are *post-hoc,* made-for-litigation rationalizations to plug a hole caused by the limitations of CBP's technology.  Deference is not warranted where, as here, an agency's position is clearly a "convenient litigating position" or "*post hoc* rationalizatio{n} advanced" to "defend past agency action against attack." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988), and *Auer*, 519 U.S. at 462).

**Third**, the Court simply owes no deference when an agency's interpretation "creates 'unfair surprise' to regulated parties." *Kisor*, 139 S. Ct. at 2417 (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007)).  The language on which CBP relies in the preamble, if read in the way CBP does, was a 180-degree departure from both the statute and the proposed rule and is therefore not a "logical outgrowth"

47

of the proposal.  *See Veterans Justice Grp., LLC v. Sec'y of Veterans Affairs*, 818 F.3d 1336, 1344 (Fed. Cir. 2016) ("A final rule is a logical outgrowth of {a} proposed rule only if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." (quoting *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 94-95 (D.C. Cir. 2010))).  Now that the Record Supplement shows a change in the government's "position"—apparently after the proposed rule was published and before the final rule issued—it is apparent that CBP should have sufficiently explained its course change excluding delinquency interest in the text of the rule instead of burying it in the preamble.

It is also clear from the absence of any comments on the 2001 proposed rule regarding delinquency interest in the Administrative Record that regulated parties were not expecting CBP to change its position and keep delinquency interest for itself, rather than distribute it to ADPs like the statute says.  Had they been aware of this, there likely would have been at least one comment raising the argument.  But there are no such comments.  And that makes sense: CBP did not explain in

the proposed rule that it was considering withholding delinquency interest. These circumstances further indicate that the preamble is not entitled to deference.

*Fourth (and finally)*, answering the interpretive question here— whether the statute or regulation covers delinquency interest—merely requires reading the statute and is thus not technically complex. Judges, rather than agencies, are better suited for that task, which "fall{s} more naturally into a judge's bailiwick." *Kisor*, 139 S. Ct. at 2417. CBP therefore has "no comparative expertise in resolving {this} regulatory ambiguity." *Id*.

### D. Deferring to CBP's Faulty Reading Would License Agency Overreach.

It has long been suggested that administrative deference "encourages agencies to be vague in framing regulations, with the plan of issuing interpretations to create the intended new law." *Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 620 (2013) (Scalia, J., concurring in part and dissenting in part (internal quotation marks omitted)); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 525 (1994) (Thomas, J., dissenting) ("It is perfectly understandable" for an agency to "issue vague regulations" if doing so will "maximiz{e} agency power."). And CBP has

done just that here. Despite starting with a statute requiring it to distribute "all interest"—including delinquency interest—to ADPs, CBP issued a regulation that, according to the Court's reading, says nothing whatsoever about delinquency interest, and now interprets that regulation to *withhold* delinquency interest from ADPs. Through these permutations, like a bureaucratic version of the grade-school game "telephone," CBP has managed to arrive at a result that cannot be squared with the statutory text.

Affording deference of any type in this scenario would license the agency's interpretive gymnastics and vitiate any meaningful limit on administrative overreach. This Court should hold that the statute means what it says—that "all interest" in fact means all interest—and that the failure of CBP to distribute delinquency interest to ADPs is *ultra vires*.

## REQUEST FOR RECONSIDERATION

Plaintiffs respectfully request that this Court reconsider its prior order that Plaintiffs' claims seeking Section 1505(d) interest on any CDSOA distributions received prior to April 18, 2015 claims are time barred. The recently submitted Administrative Record Supplement now confirms that CBP is playing an interpretive shell game. It appears that

CBP changed its mind about whether to distribute delinquency interest, and reflected that decision (if at all) with the word "only" in the preamble to the final rule.  This one word, which was tucked away in a non-binding discussion of another issue, was insufficient to give Plaintiffs notice of CBP's change in position to withhold delinquency interest (which the agency also never explained in the final rule).  Plaintiffs therefore could not have challenged that decision until they obtained such notice in 2016.

This Court "retains the plenary power to modify or alter its prior non-final rulings, particularly where the equitable powers of the court are invoked." *Timken Co. v. United States*, 569 F. Supp. 65, 68 (Ct. Int'l Trade 1983).  Rule 54 states that "any order ... that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action ... and may be revised at any time before the entry of a judgment."  USCIT R. 54(b).  Thus, "the court may reconsider its decision" in this matter "pursuant to its general authority, which is recognized by USCIT Rule 54, to reconsider a non-final order prior to entering final judgment." *Union Steel v. United States*, 804 F. Supp. 2d 1356, 1367 (Ct. Int'l Trade 2011), *judgment entered*, 37 C.I.T. 1201 (2013) (Stanceu, J.).

## I.    PRIOR RULING

This Court's prior order dismissed Plaintiffs' claims seeking Section 1505(d) interest on any CDSOA distributions received prior to April 18, 2015 on statute-of-limitations grounds.    The Court explained that, although CBP's regulation, 19 C.F.R. § 159.64(e), "cannot correctly be read as a reference to delinquency interest under 19 U.S.C. § 1505(d)," when "read together with the preamble language that pertained to it, {it} provided adequate notice of the agency's decision that any type of interest other than Section 1677g interest would not be deposited into the special accounts for distribution to ADPs."    Opinion (ECF No. 57) at 11-12.    The Court determined that, because Plaintiffs had notice of CBP's decision, they were able to challenge that decision whenever it was applied to them (i.e., whenever a distribution was made).    The Court therefore held that "plaintiffs' causes of action are barred by the two-year statute of limitations of 28 U.S.C. § 2636(i) to the extent they seek Section 1505(d) interest on any CDSOA distributions they received prior to April 18, 2015."    Opinion (ECF No. 57) at 20.

## II.  REASONS FOR RECONSIDERATION

As this Court noted at the hearing on the government's motion to dismiss, the "preamble … is a pretty thin read {sic} to carry all that weight."  May 2, 2019 H'rg Tr. (ECF No. 49) at 33.  That reed has broken, because the record now shows that CBP changed course 180 degrees between the proposed rule and the final rule, without adequately explaining what it was doing to the public.

The recently filed Administrative Record Supplement shows that, as of February 21, 2001, it was the "position of the agency" connected to the "proposed rulemaking" that the CBP "will consider possible methods" for distributing delinquency interest.  ARS 511.  That is the only position of the agency in the Administrative Record that predates the publication of the proposed rule in June 2001.  A record document dated August 19, 2001 memorializes a decision to change course, noting that the "{d}ecision has been made that accrued interest for late payment of bill," i.e., delinquency interest, "will not be made available for disbursement under the Byrd Amendment."  AR 579.

This timing is problematic. It means that, as of June 26, 2001— when CBP published its proposed rule in the Federal Register—it was

the "position of the agency" to consider ways to distribute delinquency interest.  CBP then changed course, apparently during the time between the proposed rule and the September 21, 2001 final rule.  It was incumbent on the agency to explain clearly to the public that it had changed course and the basis for that change.  But this decision is not reflected by a change in the text of the regulation.  *Compare* 66 Fed. Reg. at 33,926 (proposal) ("However, statutory interest charged on antidumping and countervailing duties at liquidation, will be transferred to the Clearing Account or Special Account, as appropriate, when collected from the importer.") *with* 19 C.F.R. § 159.64(e) (final rule) ("However, statutory interest charged on antidumping and countervailing duties at liquidation will be transferred to the Special Account, when collected from the importer.").  The proposed and final rules are materially the same.  Indeed, CBP's reading hinges entirely on the word "only," which appears only in the *preamble* to the final rule.

If CBP intended to change the substance of the proposed regulation, then it needed to do so in the text of the regulation and explain why it made the change.  And it did not.  In its opinion, this court noted that "the notice of final rulemaking contained a relevant regulatory provision

54

and text in the preamble, under a heading titled 'Interest,' that *clarified* its meaning." Opinion (ECF No. 57) at 14 (emphasis added). But now the Administrative Record Supplement changes the landscape because it is apparent that the text of the proposed rule—a materially similar version of which was later finalized—was crafted when CBP's position was that the statue required it to distribute delinquency interest. Thus, to do all the work that CBP wants it too, the preamble cannot merely *clarify* that language, it has to *change* that language. According to CBP's reading, the word "only" in the preamble does far more than clarify the final rule—it determines that an entire category of interest will not be distributed. This is a fundamental change, not the stuff of "clarification" or "interpretation."

CBP's sea change requires more explanation and process than was given here. As the D.C. Circuit noted in *MCI*, "{t}he question is whether the notice was 'adequate to afford interested parties a reasonable opportunity to participate in the rulemaking process.'" *MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1142 (D.C. Cir. 1995) (quoting *Fla. Power & Light Co. v. United States*, 846 F.2d 765, 771 (D.C. Cir. 1988)). It is hard to see how the notice was adequate here given the timing in the record of

CBP's course change.  There is no way that the preliminary rule could have prepared interested parties for the CBP's decision to go in the opposite direction than what CBP was intending when it published the proposed rule.  That point is underscored by the lack of comments on the issue.

Nor did anyone appreciate what CPB had done after issuing the final rule.  It is axiomatic that an agency can only make a substantive regulatory change—i.e., a legislative rule—through notice-and-comment rulemaking.  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96-97 (2015); *see also Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993) (holding that "an amendment to a legislative rule must itself be legislative" (quoting *Nat'l Family Planning & Reproductive Health Ass'n v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992))).  With no relevant change to the regulatory text, interested parties simply would have had no reason to think that the rule, which is at best silent about whether delinquency interest would be distributed, was intended to preclude distribution of delinquency interest (and thus no reason to comment on that basis).

56

This conclusion is supported by the fact that the preamble cannot carry the force of law, *see supra* at 38-40. The public, therefore, would have no cause to look to the preamble to change the meaning of the regulatory or statutory text. After all, we presume that agencies follow the law. *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926) ("{I}n the absence of clear evidence to the contrary, courts presume that {government officials} have properly discharged their official duties."); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001) (same). The public was simply not on notice that CBP would use the preamble en route to *ultra vires* action.

Plaintiffs lacked notice of CBP's decision to withhold delinquency interest from ADPs based on the preamble to the final regulation. Therefore, Plaintiffs respectfully submit that this Court should reconsider its prior order dismissing claims related to distributions received prior to April 18, 2015.

## CONCLUSION

For these reasons, this Court should grant judgment on the administrative record to Plaintiffs and declare that the CDSOA's references to "interest earned" in 19 U.S.C. §§ 1675c(e)(2) and (d)(3)

include delinquency interest under 19 U.S.C. § 1505(d), and that Plaintiffs are accordingly entitled to the relief specified in their Complaint.  This Court should also reconsider and ultimately vacate its prior order dismissing Plaintiffs' claims relating to distributions received prior to April 18, 2015 and enter judgment in Plaintiffs' favor on those claims.

Respectfully submitted,

/s/  *J. Michael Taylor*

J. Michael Taylor
Jeffrey M. Telep
Jeremy M. Bylund
Neal J. Reynolds
KING & SPALDING LLP
1730 Pennsylvania Ave., NW
Washington, D.C. 20006
(202) 737-0500

*Counsel to Plaintiffs*

Dated: May 24, 2021

## CERTIFICATE OF COMPLIANCE WITH THE
## COURT OF INTERNATIONAL TRADE'S STANDARD
## CHAMBERS PROCEDURES

As required by the Court's Standard Chamber Procedures, the undersigned certifies that this brief complies with the word count specified there. In particular, the undersigned certifies that the brief includes 11,857 words and therefore does not exceed the 14,000 words allowed by Chambers Procedure 2(B)(1)(a).

Date: May 24, 2021

*/s/ J. Michael Taylor*
J. Michael Taylor

## CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

I hereby certify that on this day, May 24, 2021, I caused this document to be filed electronically at the U.S. Court of International Trade. I understand that the Court's transmission of the Notice of Electronic Filing of this document constitutes service to all parties pursuant to the Court's rule for mandatory e-service.

*/s/  ·J. Michael Taylor*
J. Michael Taylor